CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 2 3 2008

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CHARLES W. DICKERSON, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:07-CV-00137 |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, ) | |
| ) | By: Hon. Michael F. Urbanski |
| Defendant. ) | United States Magistrate Judge |

Plaintiff Charles W. Dickerson ("Dickerson") brings this action pursuant to 42 U.S.C. § 1383(c)(3), incorporating 42 U.S.C. § 405(g), for review of the Commissioner of Social Security's ("Commissioner") final decision denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). The Administrative Law Judge ("ALJ") made his disability determinations pursuant to the standard five-step sequential evaluation process, the first four of which are founded upon substantial evidence. At step five, however, the ALJ erred in relying upon testimony from the Vocational Expert ("VE") that contradicted the Dictionary of Occupational Titles ("DOT") without attempting to resolve this inconsistency. As such, the ALJ's decision at step five was not founded upon substantial evidence. Consequently, this case must be reversed and remanded to the Commissioner for further administrative proceedings consistent with this opinion.

I.

Dickerson filed an application for DIB and SSI on November 8, 2002. (Administrative Record [hereinafter R.] at 89-91) Disability Determination Services ("DDS") awarded disability

benefits to Dickerson effective May 4, 2002. (R. 25) On March 4, 2005, DDS reviewed evidence alleging an improvement in Dickerson's physical condition. (R. 27, 28) DDS subsequently terminated Dickerson's disability benefits effective March, 2005. (R. 28) Dickerson's request for reconsideration was denied on March 8, 2005. (R. 35, 37-39) After an administrative review hearing on June 7, 2005, DDS denied Dickerson's appeal. (R. 43-64) Dickerson timely filed a request for a hearing before an Administrative Law Judge on July 13, 2005, and that hearing occurred on January 4, 2006. (R. 60, 68) After considering all of the evidence of record, the ALJ issued a decision denying Dickerson's request for a continuation of his disability benefits. (R. 13, 14)

Dickerson sought further review through the Appeals Council on May 15, 2006, which denied his request for review on March 2, 2007. (R. 6) On March 21, 2007, Dickerson filed the instant federal court complaint. After receiving consent from both parties, this matter was transferred to the undersigned on September 7, 2007. The case is pending on cross motions for summary judgment.

Dickerson first argues that the ALJ's assessment of his impairments was flawed and not based upon substantial evidence. Second, Dickerson argues that the ALJ erred in relying upon the testimony of the VE because the VE's testimony conflicts with the DOT. While Dickerson's first argument lacks merit, the ALJ's failure to address the conflict between the VE's testimony and the DOT requires remand of this case to address that issue.

## II.

Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the ALJ's findings "are supported by substantial evidence and whether the

correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g)). Accordingly, the reviewing court may not substitute its judgment for that of the ALJ, but instead must defer to the ALJ's determinations if they are supported by substantial evidence. Id. Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays, 907 F.2d at 1456; Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The ALJ makes disability determinations pursuant to a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). At the first step, the ALJ determines whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The second step requires a determination as to the severity of the claimant's medical impairment. 20 C.F.R. § 404.1520(a)(4)(ii). The third step requires the ALJ to determine whether the claimant has an impairment that satisfies one or more of the impairments listed in Appendix 1 of the agency's regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If an ALJ finds that a claimant meets this test, then the inquiry proceeds no further and the claimant is found to be disabled.
20 C.F.R. § 404.1520(d). Prior to proceeding to the fourth and fifth steps, the ALJ must make a residual functional capacity assessment. 20 C.F.R. § 404.1520(e). These last steps require the ALJ to consider the claimant's residual functional capacity and to analyze whether the claimant is able to perform any past relevant work or, if not, any other work. 20 C.F.R. § 404.1520(a)(4), (f), (g).

3

## III.

On May 4, 2002, Dickerson's shoulder and arm were injured in a fall from a ladder, and eventually he was awarded disability benefits. Later, these benefits were terminated due to an increase in movement and functionality in Dickerson's shoulder and arm. Dickerson disputes the termination of his benefits. At an administrative hearing held on January 4, 2006, Dickerson testified that he was unable to work due to continued shoulder pain, right hand numbness, migraines, and knee pain. (R. 488-91) He explained to the ALJ that he had "pain constantly in my shoulder every day, all day long, all night, just constant pain." (R. 489) Dickerson argues that the ALJ erred in failing to find his testimony fully credible. Furthermore, Dickerson maintains that objective medical evidence in the form of x-rays and electrical studies indicate that there is substantial evidence to support his alleged limitations. However, the medical evidence in the record depicts an injury that has healed significantly over time.

The hospital discharged Dickerson the day following his fall. (R. 169) Ten days later, Dickerson returned to the hospital complaining of constant pain in his right shoulder and a reduction in mobility. (R. 175) The attending physician noted no serious medical change since Dickerson's discharge and advised him to continue treatment as planned. (R. 176) On May 6, 2002, Dickerson was evaluated by Dr. George D. Henning at the Roanoke Orthopaedic Center. (R. 242). Henning commented in a report that Dickerson suffered "a fair amount of discomfort in the shoulder and the wrist." (R. 242) After reviewing x-rays, Henning noted that "auxiliary views show that the head/neck relationship remains good." (R. 242)

Over the following weeks, Dickerson visited Carilion Roanoke Memorial Hospital, the Roanoke Orthopaedic Center, and the Lewis Gale Clinic for treatment to his wrist and shoulder.

4

(R. 175-200, 240, 242, 244-45, 343-351, 436-37, 458-459, 463) On June 13, 2002, five weeks after the fall, Dr. Alfred A. Durham noted after a physical examination that Dickerson "states he is doing a lot better" and recommended physical therapy. (R. 193, 438) After a brief period with no apparent progress in treatment, Dr. Durham noted in early September that Dickerson had problems with shoulder abduction, mechanical alignment, and that "there is only healing on the medial side." (R. 186) More physical therapy ensued.

On September 18, 2002, Dickerson's physical therapist submitted a final assessment upon Dickerson's discharge from the physical therapy program. John Echternach, P.T., reported that "Dickerson demonstrated progress in all areas, but remained limited in several specific parameters." (R. 199) The therapist continued by detailing Dickerson's limited motion in his right arm and stated, "shoulder mobility has plateaued." (R. 199) After further examination, Dickerson opted for surgery to prepare the nonunion of his right proximal humerus fracture after discussing the risks with Dr. John W. Mann of the Roanoke Orthopaedic Center on September 25, 2002. (R. 237) Dr. Mann explained that he would surgically insert a Polaris nail. (R. 237) He discussed with Dickerson that this intramedullary device would assist in the healing of the fracture but would be accompanied by "some risk of pain in the rotator cuff region due to insertion." (R. 237) Dr. Mann performed Dickerson's surgical procedure on October 10, 2002, and Dickerson was discharged from the hospital the following day. (R. 235-37, 354-95)

Dickerson began an exercise regimen coupled with regular visits with Dr. Mann in the months following the surgery. (R. 227-234) In late November, 2002, Dr. Mann observed an improvement in Dickerson's arm movement. (R. 232) After his December appointment, Dr. Mann remarked that "he has excellent motion at this point, especially considering the long term

of immobility that he had." (R. 231) In January, 2003, Dr. Mann examined Dickerson's increased movement. (R. 230) "On examination," explained Dr. Mann in his report, "his wound has healed nicely. He has good deltoid strength. Elbow range of motion is normal. Distal sensation is intact." (R. 230) However, after viewing x-rays, Dr. Mann noted that one of the screws implanted within his shoulder had changed position. (R. 230) Dr. Mann concluded his report with instructions to Dickerson to stop smoking to "help promote fracture healing." (R. 230) Over the following two months, Dickerson notified the Roanoke Orthopaedic Center that his shoulder pain had intensified requiring additional pain medication. (R. 228-29)

Subsequent to further examination on February 14, 2003, Dr. Mann concluded that the proximal screw had "backed out at least 2-3 turns" and that "the Polaris nail seems radiographically to have failed." (R. 227) Given the complications arising from the intramedullary device, Dr. Mann advised Dickerson to visit Dr. Thomas Schuler. (R. 227) On March 21, 2003, Dr. Schuler recommended "an initial trial of nonoperative management including minimization [of] cigarettes, multivitamin and calcium supplementation, and EBI bone stimulator." (R. 224) Dickerson continued to use the bone stimulator and visited Dr. Mann on several check-up appointments from March through July. (R. 225, 397, 448-51) Though Dickerson had made increases in movement and strength, on July 1, 2003, Dr. Mann recommended surgical removal of the embedded screws in order to decrease Dickerson's persistent pain. (R. 450-51) On July 29, 2003, Dr. Mann surgically removed three screws in Dickerson's right shoulder. (R. 453-54)

There are no medical records reflecting any treatment during the remainder of 2003 and throughout 2004. On February 18, 2005, Dr. William Humphries conducted an independent

medical examination of Dickerson for the Virginia Department of Rehabilitative Services. (R. 248-53) In his report, Dr. Humphries noted that Dickerson had normal strength and motion in nearly every limb except for his right upper extremity. (R. 249) Dickerson's right shoulder and right arm still suffered with mild tenderness, slightly reduced grip, mild atrophy of the forearm, mild sensory loss, and post-traumatic degenerative joint disease. (R. 249) A disability review occurred on March 4, 2005. (R. 27-28) In a report prepared of the review, the Social Security Administration remarked that "current evaluation is necessary since medical improvement was expected." (R. 27) Dr. Richard Surrusco performed a residual functional capacity evaluation and concluded that Dickerson was capable of standing, walking, and/or sitting for up to six hours out of an eight hour day. (R. 259) The Social Security Administration determined that "the beneficiary has the residual functional capacity to perform light work." (R. 28) The report indicated that benefits would terminate in May, 2005.

Shortly before his benefits were to terminate, Dickerson visited the Carilion Roanoke Community Hospital Emergency Room seeking treatment for his shoulder pain. An x-ray taken that day, March 21, 2005, noted no abnormality and Dickerson was told to take ibuprofen and ice his arm. (R. 254-55) Two days later, on March 23, 2005, Dickerson was seen by a primary care physician claiming that he could not move his right arm. Dickerson was referred to physical therapy for evaluation, but there are no records from any subsequent physical therapy in the administrative record.

On January 16, 2006, Dr. William Hooper of Virginia Orthopaedic examined Dickerson due to a shoulder that "constantly hurts" and a hand that "goes numb." (R. 467-68) After the examination, Dr. Hooper noted that Dickerson could "abduct the right shoulder approximately

7

110 degrees, with full internal and external rotation." (R. 467) He also remarked that Dickerson had "good overall strength around the right shoulder with no focal tenderness there." (R. 467) After viewing x-rays of the right shoulder, Dr. Hooper stated that the x-rays "show what appears to be a solid union of the fracture with good purchase." (R. 468) Dr. Hooper recommended neurological diagnostic tests, and a nerve conduction and electromyography study was performed on February 8, 2006. The nerve conduction study was relatively unremarkable, showing no evidence of carpal tunnel, sensory neuropathy of the right upper arm and right cervical radiculopathy. (R. 466) The report noted only "subtle chronic appearing neurogenic changes in the right upper extremity that raise the possibility of a subtle chronic irritation predominantly in the C5 distribution." (R. 466)

Dickerson saw Dr. Hooper again on February 14, 2006 following the nerve conduction and EMG study. (R. 70-72) Upon physical examination, Dr. Hooper remarked that "he demonstrates 5/5 motor strength in all muscle groups in both upper extremities . . . mildly positive impingement sign of the right shoulder, but excellent rotator cuff strength there." (R. 470) Dr. Hooper concluded his report of the examination by opining, "since he has good strength and function around the right shoulder, I do not believe that additional shoulder surgery is indicated at this point." (R. 470-71)

In his decision, the ALJ found that Dr. Humphries' February, 2005 examination showed indications of an improvement in Dickerson's condition. (R. 18) The examination "established that the claimant made significant medical improvement in his right shoulder. (R. 18) The ALJ also relied on the medical opinions of Drs. Surrusco and Hooper and the results of the nerve conduction and EMG study. (R. 18-19) Due to the steady healing of Dickerson's shoulder since

8

the time of his injury, the ALJ determined that "as of March 1, 2005, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy." (R. 21)

An ALJ is required to analyze every medical opinion received and determine the weight to give such an opinion in making a disability determination. 20 C.F.R. § 404.1527(d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F. 3d 171, 178 (4th Cir. 2001). The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527.

In the instant matter, the ALJ correctly weighed the opinions of Dickerson's treating physicians. Overall, the accumulated medical evidence reflects a man who suffered a significant accident and received major orthopedic injuries as a result. However, the medical evidence also portrays marked improvement in Dickerson's functionality over time. The physical examinations performed by Drs. Humphries, Surrusco, and Hooper and the objective results of the nerve conduction and EMG study all reflect that though Dickerson may continue to complain of some pain in his shoulder, his strength and movement have increased dramatically since his injury. (R. 70-72, 248-53, 259, 467-68) There is no medical evidence that contradicts the opinions of Drs. Humphries, Surrusco, and Hooper. Therefore, given the significant improvements to Dickerson's shoulder as detailed in these medical reports, the ALJ's determination that

Dickerson's shoulder condition improved was based on substantial evidence. Likewise, the residual functional capacity ("RFC") found by the ALJ is well supported by substantial evidence, particularly the evaluations done by Drs. Humphries and Surrusco. Indeed, there are no medical opinions in the record stating that Dickerson cannot perform some level of work.

## IV.

On March 16, 2006, Dickerson testified that along with his shoulder pain and migraines, numbness in his right hand prevented him from working. (R. 488) Upon questioning, he testified that he felt the numbness "quite often . . . it's almost every day." (R. 488) Compared to the medical evidence documenting Dickerson's shoulder injury, the medical evidence within the record detailing Dickerson's wrist injury is less voluminous. Several months after his accident, Dr. Durham noted that Dickerson's wrist had a decrease in flexibility and appeared swollen. (R. 440) Dr. Durham opined that Dickerson might suffer from a slight case of Reflex Sympathetic Dystrophy Syndrome.[1] (R. 440) Dr. Durham instructed Dickerson to participate in a physical therapy regimen and evaluated him again on August 6, 2002. (R. 441) He noted after the evaluation that though Dickerson had a "fairly prominent base of the second metacarpal," he opined that this condition was actually identical to his uninjured left hand. (R. 441) Ten days later, Dr. Durham reported that Dickerson's wrist injury was not responding well to physical therapy. (R. 442)

---

[1] Reflex Sympathetic Dystrophy Syndrome, or RSD, is "a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain. The skin over the affected area may become swollen and inflamed. The exact cause of RSD is not fully understood, although it may be associated with injury to the nerves." WebMD at http://www.webmd.com/brain/reflex-sympathetic-dystrophy-syndrome (May 30, 2008).

10

By early September, Dickerson's wrist showed improvement. In a report dated September 9, 2002, Dr. Durham stated that "he has made some progress with PT and now has about forty degrees of supination and forty degrees of pronation . . . he also shows improvement in terms of wrist motion and less swelling and glossiness of the right upper extremity of the hand." (R. 444) Dr. Durham maintained that "with the improvement in the glossiness of his skin, I think that he is getting to the point where a little bit more PT would help him and restore him to job function." (R. 444)

In the subsequent three years, Dickerson saw a number of physicians and received multiple treatments for pain and discomfort associated with his right shoulder. In the accumulated medical reports found in the administrative record dated between September 9, 2002 and January 16, 2006, none report any changes, improvements, or declines in the overall condition of Dickerson's wrist. On January 16, 2006, twelve days after Dickerson's hearing before the ALJ, Dr. Hooper examined x-rays of Dickerson's wrist and opined, "the right wrist and hand today show evidence of scapholunate diastasis and radiocarpal arthritic changes.[2] (R 467) There is also what appears to be a dorsal chip fracture from the carpal area on the lateral view." However, Dr. Hooper also noted that Dickerson had "no visible atrophy or swelling in either forearm or hand . . . bilateral wrist compression tests negative . . . good strength and function around both elbows, wrists, and hands." (R. 467) He fitted Dickerson with a "cock-up wrist splint." (R. 468) Dr. Christopher J. Scherer performed a nerve conduction and electromyography study on Dickerson's wrist on February 8, 2006. (R. 465-66) He concluded

---

[2] Diastasis is "a form of dislocation in which there is separation of two bones normally attached to each other without the existence of a true joint. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 511 (Douglas M. Anderson, ed., Saunders 2003) (1900).

11

that "there is no electrophysiologic evidence of a right median mononeuropathy at the wrist (carpal tunnel syndrome)." (R. 466) In a followup evaluation on February 14, 2006, Dr. Hooper remarked that Dickerson's "hands appear well profused and he has reasonably good composite grip strength bilaterally." (R. 470)

Similar to his shoulder injury, Dickerson's wrist showed signs of trauma and reduced functionality shortly after his fall from the ladder. However, his wrist has continued to improve over the years. Medical evidence alleging a complete loss or serious diminishment of his wrist or hand functionality is simply absent from the administrative record. Though he may experience numbness, this sensation has not greatly lessened his wrist strength nor his ability to grasp or make fine manipulations with his right hand. In his opinion, the ALJ found that Dickerson had "mildly reduced grip strength on the right side, and mild sensory loss to light touch of the second through the fifth fingers of the right hand." (R. 18) This is consistent with the medical evidence within the administrative record. In 2002 Dr. Durham stated that with a little more healing, Dickerson would be capable of working again. (R. 444) It has been several years since that assessment and the evidence reflects its validity. It is clear that the ALJ's residual functional capacity findings, as to Dickerson's right wrist and right hand, were based upon substantial evidence.

V.

At the hearing on January 4, 2006, Dickerson testified that he was unable to work due to frequent migraines and knee pain. (R. 488-91) Regarding the migraines, Dickerson testified that "I'll get a knot, will pop up on the back of my neck, and then I'll get a real bad migraine headache. I'm on medication for that, so once that happens, I have to take a pill and I have to lay

12

down to relieve it because it gets so bad that I can't keep my eyes open." (R. 490) Dickerson testified that he experienced these migraines three to four times a week and sometimes they last for two days. (R. 490) Dickerson also testified that "I have pain in both knees. For instance, if I'm laying in bed and go to get up, at times my knees will lock and I can't get up and left one is worser [sic] than my right one." (R. 491)

The ALJ considered Dickerson's migraines and knee problem in his opinion. (R. 17) The ALJ noted that Dickerson's migraine medication has produced positive effects and that Dickerson has not had any x-rays on his knees. (R. 17) Other than his January 4, 2006 testimony regarding these ailments, Dickerson's migraines and knee pain are not described in any one of the numerous medical reports compiled in the record. Regarding Dickerson's knee problems, the ALJ stated, "the claimant's physical examinations mention no abnormalities in the lower extremities and satisfactory strength and movement. These impairments result in minimal functional limitations and are 'nonsevere.'" (R. 17) The lack of any medical evidence within the administrative record detailing any possible disabling effects from these impairments provides substantial evidence to support the ALJ's decision that Dickerson's migraines and knee pain were nonsevere impairments.

## VI.

On February 26, 2008, Dickerson filed a Supplemental Memorandum Regarding the Vocational Expert Testimony Rendered at the Plaintiff's ALJ Hearing. Dickerson argues that the ALJ erred in relying upon the testimony of the VE because the VE's testimony conflicts with the DOT. Pursuant to 20 C.F.R. § 404.1566, an ALJ may use the DOT and testimony of a VE to determine whether the claimant can find jobs in the regional and national economy. According

13

to Social Security Ruling 00-4p, the testimony of a VE should normally be consistent with the DOT. Furthermore, pursuant to that Ruling, when an apparent conflict exists between the two, the ALJ must elicit a reasonable explanation on the record as to the reason for the conflict before relying on such testimony. The ALJ must also ask the VE whether his testimony is consistent with the DOT. Id. When an ALJ relies upon testimony that is incorrect or outdated, then the ALJ's decision is not supported by substantial evidence and thus necessitates a remand. English v. Shalala, 10 F.3d 1080, 1084-85 (4th Cir. 1993).

The VE testified that Dickerson could perform work as a security guard at the light exertional, unskilled level, as a cashier at the light exertional, unskilled level, and as a cashier at the sedentary exertional, unskilled level. (R. 505) Dickerson points out that the ALJ found that Dickerson is only capable of performing occasional reaching. (R. 19) According to the DOT, both the security guard position at the light exertional, unskilled level (372.667-034) and the cashier position at the light exertional, unskilled level (211.462-010), require *frequent* reaching, not merely *occasional* reaching. U.S. Dep't of Labor, Employment & Training Admin., Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles § 07.03.01, 211.462-010 (Cashier II), § 04.02.02, 372.667-034 (Security Guard) (1993). Furthermore, Dickerson, argues and the Commissioner does not suggest otherwise, that the DOT does not contain a cashier position at the sedentary exertional, unskilled level. The ALJ fulfilled the requirement imposed by Social Security Ruling 00-4p to ask the VE to explain any deviation of his testimony from the DOT. (R. 497) However, the VE did not explain the potential inconsistency between frequent reaching required for these jobs by the DOT and the RFC found by the ALJ reflecting only occasional reaching. As a consequence, the ALJ's finding that

14

"pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles," (R. 21), is not on solid ground, as an unresolved inconsistency exists.

In response, the Commissioner does not dispute that the jobs cited by the VE require frequent reaching or that the ALJ's RFC only allowed for occasional reaching with Dickerson's right arm. Rather, the Commissioner argues that there is no inconsistency between the DOT's requirement of frequent reaching and Dickerson's RFC limiting him to occasional right arm reach because, as stated in SSR 00-4p, "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." SSR 00-4p. While it is true that the DOT's reference to frequent reaching may well be the maximum requirement for cashier or security guard jobs, the VE did not provide any testimony, much less a reasonable explanation, why Dickerson could do one of these jobs while limited to only occasional reaching with his right arm. It is not enough for the Commissioner to now argue that the reaching discrepancy may be explained by the fact that the DOT reflects maximum requirements. As SSR 00-4p makes clear, the ALJ must elicit a reasonable explanation for an inconsistency between the jobs listed by the VE and requirements of the DOT. Failure to do so at the hearing renders judicial review impossible as all we are left with is speculation as to why the VE felt a person with Dickerson's RFC could do these jobs. Was it because the VE was not aware of the inconsistency? Was it because the VE had certain cashier or security guard jobs in mind that only required occasional reaching? Or was it because the VE felt that Dickerson could perform

frequent reaching jobs with his left arm? These questions cannot be answered on this record, and a reviewing court cannot be expected to guess as to how, if at all, the VE would attempt to reconcile this inconsistency. SSR 00-4p requires that this inconsistency be explained, and at step five it is the Commissioner's obligation to do so.

Finally, there is no merit to the Commissioner's agreement that the ALJ could rely on the VE's testimony because the jobs listed by the VE were only examples, and not an exhaustive list, citing Jones v. Commissioner, 364 F.3d 502, 506 (3rd Cir. 2004). In fact, the VE's testimony was quite to the contrary. Rather than provide mere examples as the Commissioner suggests the VE did, the VE testified that "[i]t's a pretty limited occupational base and that's most of the potential occupations that I'd suggest would fall into one of those two categories." (R. 505)

In sum, although the ALJ correctly evaluated the record evidence and appropriately determined Dickerson's residual functional capacity, the ALJ did not resolve the conflict between the DOT and the VE's testimony as required by SSR 00-4p. As a result, this case must be remanded for that purpose and for any further evidence at step five.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion and accompanying Order to all counsel of record.

ENTER: This 23rd day of June, 2008.

/s/ Michael F. Urbanski
Michael F. Urbanski
United States Magistrate Judge